## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                              )

**PROJECT ON GOVERNMENT**  )
**OVERSIGHT, INC.**  )
**1100 G St NW**  )
**Suite 500**  )
**Washington, D.C. 20005,**  )
  )
      **Plaintiff,**  )
  )
**v.**  )     **Case No: 19-3372**
  )
**U.S. IMMIGRATION AND CUSTOMS**  )
**ENFORCEMENT**  )
**500 12th Street, SW, Stop 5009**  )
**Washington DC, 20536-5009**  )
  )
      **Defendant.**  )
_____)

## COMPLAINT

Plaintiff, Project On Government Oversight ("POGO"), brings this action against the

Defendant, U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement

agency ("ICE") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the

Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking declaratory and injunctive

relief to compel compliance with the requirements of FOIA, including immediate release of

records requested by POGO.

## I.     INTRODUCTION

1. POGO asserts violations of FOIA by ICE for failing to provide responsive documents

concerning various matters involving ICE.

2. From May 2018 to June 2019, POGO filed various FOIA requests with ICE.

3. The following eight FOIA requests submitted to ICE are the subject of this action:

| Date | Requestor | Subject | Exhibit |
|------|-----------|---------|---------|
| May 29, 2018 | Jake Laperruque | Surveillance Capabilities and Activities | A |
| September 17, 2018 | Katherine Hawkins | Civil Rights and Civil Liberties | B |
| March 22, 2019 | Andrea Peterson | Immigration and Detention | C |
| March 28, 2019[1] | Andrea Peterson | Immigration and Detention | D |
| June 17, 2019 | Jake Laperruque | Surveillance Capabilities and Activities | E |
| June 17, 2019 | Jake Laperruque | Surveillance Capabilities and Activities | F |

4.   These requests have resulted in either incomplete productions, no production, and in some, no acknowledgement of the requests whatsoever.

5.   FOIA requires ICE to respond within 20 business days, excluding Saturdays, Sundays, and legal holidays. ICE has not requested any extensions of time to process these requests, nor have they offered any explanation to their lack of communication about certain of the requests.

6.   POGO seeks a declaration that ICE violated FOIA by failing to disclose responsive records by the statutory deadline and an injunction ordering ICE to produce all non-exempt, responsive records by a date certain, without further delay.

## II.       JURISDICTION AND VENUE

7.   This Court has both subject matter jurisdiction over the parties pursuant to 5 U.S.C. §§ 552(a)(4)(B) and 552(a)(6)(C)(i). This Court also has jurisdiction over this action pursuant to

---

[1]      This request was originally submitted to Department of Homeland Security ("DHS") Office of Inspector General ("OIG") on March 22, 2019. OIG found two pages of responsive records and informed POGO on March 28, 2019 that the pages and the request had been referred to ICE. *See* March 28, 2019 OIG letter, attached hereto as Exhibit G, p. 1.

28 U.S.C. §§ 1331, 2201(a), and 2202. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B)

and 28 U.S.C. § 1391(e).

### III.    PARTIES

8.   Plaintiff POGO is a nonpartisan independent organization based in Washington, DC

organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO

champions reforms to achieve a more effective, ethical, and accountable federal government that

safeguards constitutional principles. POGO's investigators and journalists take leads and

information from insiders and verify the information through investigations using FOIA,

interviews, and other fact-finding strategies. POGO's investigative work has been recognized by

Members of Congress, executive branch officials, and professional journalism organizations. For

instance, in 2015, POGO won the Society of Professional Journalists Washington, D.C.

Professional Chapter's highest journalistic award, the Robert D.G. Lewis Watchdog Award, for

reporting on the Department of Justice's opaque system for handling allegations of attorney

misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing

Business Editing & Writing for our investigative series scrutinizing the government's oversight

of offshore drilling. POGO extensively used records obtained under FOIA for this investigation.

9.   Defendant ICE is an office of the Department of Homeland Security ("DHS"), a

federal agency within the meaning of FOIA, 5 U.S.C. § 552(f)(1), and headquartered in

Washington, DC. ICE has possession, custody, and control of the records POGO seeks in this

action.

### IV.    FREEDOM OF INFORMATION ACT

10. FOIA requires federal agencies, upon request, to make records "promptly available to

any person." 5 U.S.C. § 552(a)(3)(A).

11. The agency must provide the public records when they are requested by the public, in order "to ensure an informed citizenry, vital to the functioning democratic society." *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

12. An agency must determine whether to comply with a FOIA request within twenty business days and "shall immediately notify the person making such request of such determination and the reasons therefor." 5 U.S.C. § 552(a)(6)(A)(i); *see also* 15 C.F.R. § 4.6(b).

13. The twenty-day deadline for an agency to determine whether to comply with a request begins on the earlier of: l) the date "the request is first received by the appropriate component of the agency" or (2) "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(ii).

14.  In unusual circumstances, the time limits prescribed may be extended by written notice to the person making such request setting forth the reasons for such extension and the date on which a determination is "expected" to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B)(i).

15. If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. 5 U.S.C. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

## V.      BACKGROUND AND PUBLIC INTEREST IN THE RECORDS SOUGHT

### i.      U.S. Immigration and Customs Enforcement

16. DHS's overriding mission is to lead a unified national effort to protect the United States. ICE is the largest investigative agency within DHS and is charged with enforcing a wide

array of laws, including laws related to securing the border and combating criminal smuggling.
Pub. L. 112–205, §2(1), Dec. 7, 2012, 126 Stat. 1487.

17. ICE was created in 2003 through a merger of the investigative and interior
enforcement elements of the former U.S. Customs Service and the Immigration and
Naturalization Service. ICE now has more than 20,000 law enforcement and support personnel in
more than 400 offices in the United States and around the world.

18. The agency has an annual budget of approximately $6 billion, primarily devoted to
three operational directorates — Homeland Security Investigations ("HSI"), Enforcement and
Removal Operations ("ERO") and Office of the Principal Legal Advisor ("OPLA"). A fourth
directorate – Management and Administration ("M&A") – supports the three operational
branches to advance the ICE mission.

19. HSI is a critical investigative arm of the Department of Homeland Security and is a
vital U.S. asset in combating criminal organizations illegally exploiting America's travel, trade,
financial and immigration systems.

20. HSI has broad legal authority to enforce a diverse array of federal statutes. It uses this
authority to investigate all types of cross-border criminal activity, including:

- Financial crimes, money laundering and bulk cash smuggling;

- Commercial fraud and intellectual property theft;

- Cybercrimes;

- Human rights violations;

- Human smuggling and trafficking;

- Immigration, document and benefit fraud;

- Narcotics and weapons smuggling/trafficking;

- Transnational gang activity;

- Export enforcement; and,

- International art and antiquity theft.

21. ERO identifies and apprehends removable aliens, detains these individuals when necessary and removes illegal aliens from the United States.

22. ERO transports removable aliens from point to point, manages aliens in custody or in an alternative to detention program, provides access to legal resources and representatives of advocacy groups and removes individuals from the United States who have been ordered to be deported.

23. OPLA serves as the exclusive representative of DHS in immigration removal proceedings before the Executive Office for Immigration Review, litigating all removal cases including those against criminal aliens, terrorists, and human rights abusers.

### ii.      ICE Data Collection Methods

24. ICE arrests can happen in a variety of ways including utilizing government databases to help track fugitives, detaining suspects in courthouses and taking custody of people after local or state police have arrested them.

25. ICE has used various non-DHS databases profile, identify and track suspected violators of U.S. immigration laws.

> ICE has access not only to 5 billion records gathered by private businesses, but also to 1.5 billion data points contributed by over 80 local law enforcement agencies from more than a dozen states. Often, these data-sharing agreements stem from friendly professional relationships between local police and ICE, but these casual arrangements may violate ICE privacy policies and state and local data-sharing laws—particularly in cases where the data originates from sanctuary cities.

*See* Excerpts from March 13, 2019 *Wired* article, attached hereto as Exhibit H, p. 2.

26. A second example was discussed when on July 7, 2019, *The New York Times*' Catie Edmonson reported ("ICE Used Facial Recognition to Mine State Driver's License Databases") that ICE is using driver's license databases to employ facial recognition software to analyze millions of photos without motorists' knowledge of consent:

> In at least three states that offer driver's licenses to undocumented immigrants, ICE officials have requested to comb through state repositories of license photos, according to newly released documents. At least two of those states, Utah and Vermont, complied, searching their photos for matches…[i]n the third state, Washington, agents authorized administrative subpoenas of the Department of Licensing to conduct a facial recognition scan of all photos of license applicants[.]

*See* July 7, 2019, *The New York Times* article, attached hereto as Exhibit I, p. 1.

27.     Rekognition is a service marketed by Amazon subsidiary Amazon Web Services and among other things, is an image recognition service that detects objects, scenes, and faces. *See* Amazon Rekognition FAQs, attached here to as Exhibit J.

28.     According to documents obtained by POGO, Amazon pitched its facial-recognition system in the summer of 2018 to ICE. *See* October 23, 2018 *Daily Beast* article, attached hereto as Exhibit K, p. 1.[2]

29.     According to a *Washington Post* article published on July 7, 2019, ICE frequently requests that states assist it in running facial recognition searches against state department of motor vehicle photo databases. See July 7, 2019 *Washington Post* article., attached hereto as Exhibit L, p. 4.

---

[2]     The meeting between Amazon and ICE was made public through a separate FOIA filed by POGO. During the meeting, held in June 2018, officials from ICE and Amazon Web Services talked about implementing the company's Rekognition face-scanning platform to "assist with homeland security investigations." *See* October 23, 2018 *Washington Post* article, attached hereto as Exhibit M, p. 1.

30.     According to testimonials from ICE field officers, facial recognition has been used to assist in the arrest of undocumented immigrants. One official described his experience with the technology by saying, "[p]ulled out three aliens who were recent jail releases. Took pictures and let the machine do the rest."[3] *See* ICE Testimonial excerpts, attached hereto as Exhibit N, p. 2.

31.     Another official arrested an individual because his "spidey sense" led him to believe the arrested individual was undocumented; the ICE official then "still not knowing exactly who I had in custody," used facial recognition to check the arrested individual's identity and prior record. *Id.*, pp. 2-3.

32.     There is an issue concerning the efficacy of the facial recognition software; "numerous studies, including research by the U.S. Government Accountability Office and the MIT Media Lab, have shown that facial recognition technology is more likely to mistakenly identify people of color as targets—which can lead to wrongful arrests." Exhibit K, p. 2.

### iii.    ICE Detention Conditions

33. Once detained by ICE, there have been numerous investigations into the handling and treatment of detainees, including civil rights violations, child and family separation and in some cases death.

34. In 2009, Congress set out to provide comprehensive immigration reform, including detention conditions by appointing an Immigration Detention Commission that would set forth provisions regarding:

(1) Immigration enforcement protections;
(2) unlawful detentions;
(3) protections for vulnerable populations;
(4) apprehension procedures for families and family detention;
(5) welfare requirements for children separated from detained or removed parents;

---

[3]     The same testimonial indicated that the software confirmed a 99.6% match on two of the individuals but only a 68% match on the third. Exhibit M, p. 2.

(6) unaccompanied alien children; and
(7) female detainees.

CIR ASAP Act, H.R. 4321, 11th Cong. (2009).

35. On December 12, 2011, then ICE Director John Morton announced that the agency

would immediately take steps to overhaul the immigration detention center including improving

medical care, custodial conditions, fiscal prudence, and ICE oversight. *See* 2009 Immigration

Detention Reforms press release, attached hereto as Exhibit O, p. 1.

36. DHS's Office for Civil Rights and Civil Liberties was established to:

(1) review and assess information concerning abuses of civil rights, civil liberties, and profiling on the basis of race, ethnicity, or religion, by employees and officials of the Department;
(2) make public through the Internet, radio, television, or newspaper advertisements information on the responsibilities and functions of, and how to contact, the Officer;
(3) assist the Secretary, directorates, and offices of the Department to develop, implement, and periodically review Department policies and procedures to ensure that the protection of civil rights and civil liberties is appropriately incorporated into Department programs and activities;
(4) oversee compliance with constitutional, statutory, regulatory, policy, and other requirements relating to the civil rights and civil liberties of individuals affected by the programs and activities of the Department;
(5) coordinate with the Privacy Officer to ensure that—
   A. programs, policies, and procedures involving civil rights, civil liberties, and privacy considerations are addressed in an integrated and comprehensive manner; and
   B. Congress receives appropriate reports regarding such programs, policies, and procedures; and
(6) investigate complaints and information indicating possible abuses of civil rights or civil liberties, unless the Inspector General of the Department determines that any such complaint or information should be investigated by the Inspector General.

*See* 6 U.S.C. § 345.

37. On December 1, 2016, the DHS-commissioned Homeland Security Advisory

Committee issued a "Report of the Subcommittee on Privatized Immigration Detention

Facilities." It cited CRCL as providing the most "intensive inspections" in DHS's inspections

structure for detention facilities:

> DHS's Office of Civil Rights and Civil Liberties (CRCL), which
> reports directly to the Secretary of Homeland Security, receives
> complaints from detained individuals and their counsel, and also
> follows other sources of information about conditions in ICE
> detention facilities. Based on its review of complaints and further
> inquiry, it makes recommendations to the Department for changed
> practices, and it also schedules 10-15 intensive site visits each year
> to ICE detention facilities, led by experienced CRCL officers and
> also involving subject matter experts.

*See* Excerpts from Homeland Security Advisory Council Report, attached hereto as

Exhibit P, p. 14.

38. ERO uses the Segregation Review Management System (SRMS), to track, review,

and oversee ICE detainee segregation cases. Segregation—whether administrative or

disciplinary—is the process of removing a detainee from the general detainee population into a

separate, individual unit. *See* SharePoint Matter Tracking Systems Report, Appendix C, attached

hereto as Exhibit Q, p. 1.

39. According to a June 3, 2019 DHS Office of Inspector General report:

> [I]nspections of four detention facilities revealed violations of ICE's
> 2011 Performance-Based National Detention Standards, which set
> requirements for facilities housing detainees. This report
> summarizes findings on our latest round of unannounced inspections
> at four detention facilities housing ICE detainees. Although the
> conditions varied among the facilities and not every problem was
> present at each, our observations, detainee and staff interviews, and
> document reviews revealed several common issues. Because we
> observed immediate risks or egregious violations of detention
> standards at facilities in Adelanto, CA, and Essex County, NJ,
> including nooses in detainee cells, overly restrictive segregation,
> inadequate medical care, unreported security incidents, and
> significant food safety issues, we issued individual reports to ICE
> after our visits to these two facilities. All four facilities had issues
> with expired food, which puts detainees at risk for food-borne
> illnesses. At three facilities, we found that segregation practices

violated standards and infringed on detainee rights. Two facilities failed to provide recreation outside detainee housing units. Bathrooms in two facilities' detainee housing units were dilapidated and moldy. At one facility, detainees were not provided appropriate clothing and hygiene items to ensure they could properly care for themselves. Lastly, one facility allowed only non-contact visits, despite being able to accommodate in-person visitation. Our observations confirmed concerns identified in detainee grievances, which indicated unsafe and unhealthy conditions to varying degrees at all of the facilities we visited.

*See* OIG-19-47 - Concerns about ICE Detainee Treatment and Care at Four Detention Facilities, attached hereto as Exhibit R, p. 3.

40. Congressional requirements described in the Department of Homeland Security Appropriations Bill (2018) require ICE to make public all reports regarding an in-custody death within 90 days. The table found at https://www.ice.gov/death-detainee-report includes those reports, beginning in Fiscal Year 2018.

### iv.     Public Interest

41. The records POGO requested concern the activities of ICE, the methods it employs to profile, identify, and track individuals; the types of complaints it receives and how the agency handles those complaints; and detention methods, practices and standards.

42. POGO seeks to highlight how ICE collects data, handles complaints filed against it, what those complaints say, what its investigators find as well as potential civil rights violations and deaths of detainees.

43. The records would be likely to contribute to public understanding of ICE's system for collecting data absent knowledge of consent of citizens, as well as civil rights and civil liberties complaints.

44. The information to be disclosed is likely to contribute to an increased public understanding of government activities, as it relates to powerful and troubling technological

323083bd780911e7

capabilities that federal law enforcement may be considering harnessing. If used, this technology would be externally directed toward the public and the public has a great interest in whether the government is taking steps to utilize this technology. The information released would help the public evaluate federal law enforcement efforts in this arena.

45. The information would help to establish a standard threshold for identity confirmation.

46. The records requested would provide additional currently nonpublic details on ICE and companies paid by taxpayer dollars as they relate to the activities of ICE, its contractors and subcontractors, and the care provided to detainees.

47. The records would be likely to contribute significantly to public understanding of allegations of rights violations, inhumane conditions of confinement, and inadequate medical care provided in ICE detention centers, and in conditions at family detention centers-records would be likely to contribute to public understanding of medical care provided in ICE detention centers—a controversial topic that has generated numerous high-profile news stories in recent years.

48. Disclosure of the records is likely to contribute significantly to the public's understanding of the challenges of how the government approaches use of segregation in the context of immigrant detainees.

49. The records would be a significant contribution because the review mandated by the 2009 Immigration Detention Reforms was never made public and internal ICE records documenting savings from denials of healthcare requests have not been made public in over a decade.

## VI.    PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUESTS

### i.   Request A

50. On May 29, 2018, POGO employee Jake Laperruque submitted a FOIA request via

electronic mail to CRCL which requested:

> •       Any communications between government officials and
> representatives of Amazon or AWS regarding facial recognition
> technology or Rekognition.
> •       Any procurement or contracting documents related to
> Rekognition or other real-time facial recognition tools, including but
> not limited to Requests For Proposals, invoices, and licensing
> agreements.
> •       Any marketing materials or other information describing
> real-time facial recognition tools such as Rekognition received by
> government officials, including but not limited to emails,
> advertisements, specification documents, and presentations.
> •       Any training or policy and procedures materials related to
> Rekognition or other real-time facial recognition tools.
> •       Any records or analysis assessing accuracy of real-time
> facial recognition tools such as those provided by Amazon or AWS,
> or plans to audit and review accuracy of real-time facial recognition
> tools provided by Amazon or AWS.

Exhibit A, ("Request A"), p. 1.

51. On June 25, 2018, POGO received an acknowledgment letter for Request A and it

was assigned the reference number 2018-ICFO-45230.

52. ICE's acknowledgment letter stated:

> Due to the increasing number of FOIA requests received by this
> office, we may encounter some delay in processing your request.
> Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5,
> ICE processes FOIA requests according to their order of receipt.
> Although ICE's goal is to respond within 20 business days of receipt
> of your request, the FOIA does permit a 10- day extension of this
> time period. As your request seeks numerous documents that will
> necessitate a thorough and wide-ranging search, ICE will invoke a
> 10-day extension for your request, as allowed by Title 5 U.S.C. §
> 552(a)(6)(B). If you care to narrow the scope of your request, please
> contact our office. We will make every effort to comply with your
> request in a timely manner.

*See* June 25, 2018 Acknowledgment letter, ("Request A Acknowledgment")

attached hereto as Exhibit S, p. 1.

53. Request A Acknowledgment also indicated that ICE had "queried the appropriate

program offices within ICE for responsive records." *Id.*

54.  On September 17, 2018, ICE issued a final response to Request A. *See* September

17, 2018 Final Response, attached hereto as Exhibit T.

55. ICE searched HSI, the Office of Acquisitions, and the Office of the Chief Financial

Officer for documents and produced three redacted pages. Exhibit U, p. 1.

56. ERO, however, was not listed as one of the queried entities.

57. On September 20, and September 26, 2018 Mr. Laperruque emailed ICE to learn why

ERO was not included and if a subsequent search could be conducted of ERO documents. *See*

September 2018 ICE emails, attached hereto as Exhibit V, p. 1.

58. On September 27, ICE responded via an email which stated that "a search of ERO

was not conducted." *Id.*

59. On November 9, 2018, pursuant to 5 U.S.C § 552 and 6 C.F.R. Part 5 § 5.8, POGO

appealed ICE's exclusion of ERO in its search for documents responsive to Request A. *See*

Request A Appeal, attached hereto as Exhibit W.

60. Request A Appeal was granted on December 11, 2018 and assigned the appeal

number 2019-ICAP-00085. *See* ICE Acceptance of Appeal, attached hereto as Exhibit X.

61. ICE determined that "new search(s) or modifications to the existing search(s), could

be made." Exhibit X, p. 1.

62. ICE remanded the request to the ICE FOIA office for "processing and re-tasking to the appropriate agency/office(s) to obtain any responsive documents" and that the ICE FOIA office would respond directly to POGO. *Id.*, p. 2

63. POGO subsequently sent several emails asking ICE FOIA to provide an update of the status of the ERO search but did not receive replies. *See* February emails to ICE FOIA, attached hereto as Exhibit Y.

64. Additionally, POGO made multiple phone calls to the ICE FOIA office which went unanswered and there was no available voicemail.

65. On March 19, 2019, ICE FOIA replied saying that the appropriate component of DHS had been queried and that if any responsive records were located, they would be reviewed for determination of releasability. *See* March Status emails, attached hereto as Exhibit Z. They were unable to provide an estimated completion date.

66. On May 7, 2019, POGO again attempted to get a status update. ICE FOIA replied on May 16, 2019 stating that the FOIA request had been processed and closed and that the final response was delivered on September 17, 2018. *See* May Status Request, attached hereto as Exhibit AA.

67. Because the May 16, 2018 email contradicted both the appeal acceptance and the March 19, 2018 email, POGO reached out once again to get an update on the status of the ERO search on May 31, 2019. *See* May 31, 2019 Status request, attached here to as Exhibit BB.

68. ICE FOIA replied on June 4, 2019, stating that "the appeal is currently assigned to the appropriate program office(s) for search…[and o]nce the search is completed the results will be reviewed by the FOIA office and a response will be processed." *See* June 4, 2019 email, attached hereto as Exhibit CC.

69. This response contradicts the May 16, 2019 email that says that the matter was closed.

70. From September 17, 2018 through June 4, 2019 ICE has provided POGO with inconsistent information regarding the status of the ERO search guaranteed by the appeal acceptance.

71. On October 7, 2019, ICE sent POGO its final response for Request Appeal A which stated that, "no additional records responsive to your request were found." *See* October 7, 2019 Final Response, attached hereto as Exhibit DD.

72. Given that it is public knowledge that ICE and Amazon have met and discussed with respect to use of Rekognition by the agency, that ICE solicits facial recognition searches from other government entities, and that field officers have used facial recognition for arrest of undocumented officials, it is seemingly unlikely that there are no relevant records that exist within ERO.

73. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for ICE's failure to disclose them.

### ii.      Request B

74. On September 18, 2018, POGO employee Katherine Hawkins submitted a FOIA request via electronic mail to ICE which requested:

> Records [dated from January 1, 2013 to the present] of Immigration and Customs Enforcement's written response to: (1) complaint investigations, findings and recommendations from the Department of Homeland Security's Office of Civil Rights and Civil Liberties and (2) reports, findings and recommendations by subject matter experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties.

*See* September 17, 2018 ICE Response FOIA Request, ("Request B") attached hereto as Exhibit B.

75. On June 4, 2018, POGO received an acknowledgment letter for Request B and it was assigned the reference number 2018- HQFO-01485. *See* September 19, 2018 Acknowledgment letter, ("Request B Acknowledgment") attached hereto as Exhibit EE, p. 1.

76. ICE's acknowledgment letter stated:

> Due to the increasing number of FOIA requests received by this office, we may encounter some delay in processing your request. Consistent with 6 C.F.R. Part 5 § 5.5(a) of the DHS FOIA regulations, the Department processes FOIA requests according to their order of receipt.  Although DHS' goal is to respond within 20 business days of receipt of your request, FOIA does permit a 10-day extension of this time period in certain circumstances under 6 C.F.R. Part 5 § 5.5(c)…, DHS will invoke a 10-day extension for your request[.]

*Id.*, p. 1.

The Request B Acknowledgment also conditionally granted POGO a fee waiver.

77. To date, POGO has received no documents responsive to Request B.

78. More than 30 business days have passed since Request B was acknowledged and ICE has provided no further update on the status of these requests.

79. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for ICE's failure to disclose them.

### iii.    Request C

80. On March 22, 2019, POGO employee Andrea Peterson submitted a FOIA request via electronic mail to ICE which requested:

> Any records from ICE'S Segregation Review Management System, created from June 1, 2018 through the present, less any information redactions required by law.

*See* March 22, 2019 SRMS FOIA Request, ("Request C") attached hereto as Exhibit C.

81. On April 3, 2019, POGO received an acknowledgment letter for Request C and it was assigned the reference number 2018- ICFO-32901. *See* April 3, 2019 Acknowledgment letter, ("Request C Acknowledgment") attached hereto as Exhibit FF, p. 1.

82. ICE's acknowledgment letter stated:

> Per Section 5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, ICE processes FOIA requests according to their order of receipt. Although ICE's goal is to respond within 20 business days of receipt of your request, the FOIA does permit a 10- day extension of this time period. As your request seeks numerous documents that will necessitate a thorough and wide-ranging search, ICE will invoke a 10-day extension for your request, as allowed by Title 5 U.S.C. § 552(a)(6)(B).

*Id.*, p. 1.

83. The Request C Acknowledgment incorrectly classified POGO as a "Commercial requester" and as such, POGO would be liable for the expense of the agency's search and production.

84. On April 29, Ms. Peterson emailed ICE FOIA, requesting that POGO be reclassified as a "Media Requester." *See* Request for Reclassification, attached hereto as Exhibit GG.

85. To date, POGO has received no response to this email, despite several follow-up emails and phone calls. *See* Follow-up emails, attached hereto as Exhibit HH.

86. On July 10, ICE FOIA emailed POGO indicating that they had "queried the appropriate component of DHS for responsive records…[and i]f any responsive records are located, they will be reviewed for determination of releasability. *See* ICE Update, attached hereto as Exhibit II. This email did not provide any information regarding POGO's request for reclassification.

87. More than 6 months have passed, and ICE has not produced any records whatsoever and have provided virtually no valid indication of when they will do so.

88. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for ICE's failure to disclose them.

### iv.    Request D

89. On March 22, 2019, POGO employee Andrea Peterson submitted a FOIA request via electronic mail to ICE which requested:

> Appendix C: "Expanded Guidance for Submitting Segregation Notifications" from OIG-17-119, "ICE Field Offices Need to Improve Compliance with Oversight Requirements for Segregation of Detainees with Mental Health Conditions.

*See* March 22, 2019 ICE Response FOIA Request, ("Request D") attached hereto as Exhibit D.

90. On March 28, 2019 POGO received an acknowledgment letter for Request D and it was assigned the reference number 2018-IGFO-00114. *See* March 28, 2019 Acknowledgment letter, ("Request D Acknowledgment") attached hereto as Exhibit JJ, p. 1.

91. ICE's acknowledgment letter stated:

> Your request has been placed in the queue for processing in the order in which it was received. We anticipate responding to your request within 20 business days. Please note, however, that the actual time required to respond to your request depends on the number and types of responsive records identified and located in our records search.

*Id.*, p. 1.

92. The Request D Acknowledgment did not determine a decision on POGO's request for a fee waiver.

93. On March 28, 2019 ICE sent a second letter to POGO stating that the search resulted in two pages of responsive documents and that those documents were being referred to ICE for review, and Request C was being reassigned to ICE. *See* March 28, 2019 Final Response, attached hereto as Exhibit KK.

94. On September 9, 2019, POGO emailed ICE FOIA for a status update on Request C. *See* September ICE emails, attached hereto as Exhibit LL.

95. On September 12, 2019, ICE FOIA replied saying that the request is currently under review and had been assigned the new case number, 2019-ICFO-34625. *Id.*

96. To date, POGO has received no documents responsive to Request D.

97. More than 6 months have passed since Request D was acknowledged and ICE has provided no estimated date of production for the two pages of responsive documents.

98. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for ICE's failure to disclose them.

### v.       Request E

99. On June 17, 2019, Jake Laperruque submitted another FOIA request via electronic mail to ICE which requested:

> • Any training, policy, or procedures materials related facial recognition technology from January 1, 2018 onwards.
> • Any communications between government officials and representatives of Amazon or AWS regarding facial recognition technology or Rekognition from January 1, 2018 onwards.
> • Any procurement or contracting information related to Rekognition or other facial recognition technology, including but not limited to all contract or grant materials, including but not limited to requests for proposals, solicitations, award records, invoices, and licensing agreements from January 1, 2018 onwards.
> • Any marketing materials or other information describing facial recognition tools such as Rekognition received by government officials, including but not limited to emails, advertisements, specification documents, and presentations by Amazon, AWS, or any other facial recognition contractors or grantees from January 1, 2018 onwards.
> • Any information, including records or analysis, assessing accuracy of facial recognition tools such as those provided by Amazon, AWS, or any other facial recognition contractors or grantees, or plans to audit and review accuracy of facial recognition tools provided by Amazon, AWS, or any other facial recognition contractors or grantees from January 1, 2018 onwards.

Exhibit E, ("Request E"), p. 1.

100.    This request was a slightly broader version of Request A.

101.    On July 22, 2019, POGO sent an email to ICE to check the status of this request, which has yet to be answered. *See* Status of June 2019 Rekognition Requests email, attached hereto as Exhibit MM.

102.    To date, POGO has not received an acknowledgment of Request E.

103.    More than 30 business days have passed since Request E was submitted and ICE has provided no update on the status of these requests.

104.    Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for ICE's failure to disclose them or acknowledge the request.

### vi.    Request F

105.    On June 17, 2019, Jake Laperruque submitted a FOIA request via electronic mail to ICE which requested:

> • All communications, including emails (including attachments), memos, texts, or other electronic communications regarding FOIA request #2018-ICFO-45230 and appeal #2019-ICAP-00085.
> • All communications, including emails (including attachments), memos, texts, or other electronic communications from October 19 to October 31 that contain any of the following terms: "facial recognition," "face recognition," "Rekognition," or "Amazon."

Exhibit F, ("Request F"), p. 1.

106.    This request focused on internal ICE communications regarding Request A.

107.    On July 22, 2019, POGO sent an email to ICE to check the status of this request, which has yet to be answered. Exhibit NN.

108.    To date, POGO has not received an acknowledgment of Request F.

109.    More than 30 business days have passed since Request F was submitted and ICE has provided no update on the status of these requests.

110.    Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for ICE's failure to disclose them or acknowledge the request.

## VII.    CAUSES OF ACTION

### COUNT 1
**Violation of the FOIA for Failure to make Promptly
Available the Records Sought by Plaintiff's Requests**

111.    Paragraphs 1-110 are re-alleged and reincorporated herein by reference.

112.    Plaintiff properly requested records within the possession, custody, and control of Defendants.

113.    Defendant's Failure to make promptly available the records sought by Plaintiff's requests violates the FOIA, 5 U.S.C. § 552(a)(3)(A).

### COUNT 2
**Violation of the FOIA for Failure to Timely Respond to Plaintiff's Requests**

114.    Paragraphs 1-113 are re-alleged and reincorporated herein by reference.

115.    Plaintiff properly requested records within the possession, custody, and control of Defendants.

116.    Defendant's failure to respond timely to Plaintiffs' request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and DHS' own regulation promulgated thereunder, 6 C.F.R. § 5.6(c).

## VIII.   PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, POGO, prays for the following relief:

a.   As to Count 1:
   i.   Order Defendant to immediately state which records it intends to disclose in response to Plaintiff's FOIA requests;
   ii.  Order Defendant to provide a schedule of production to Plaintiff;

    iii.  Order Defendant to disclose all responsive, non-exempt records by a date certain without further delay;

    iv.  Order Defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;

    v.  Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;

    vi.  Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and

    vii.  Grant such other relief as the Court may deem just and proper.

b.  As to Count 2:

    i.  Order Defendant to immediately state which records it intends to disclose in response to Plaintiff's FOIA requests;

    ii.  Order Defendant to provide a schedule of production to Plaintiff;

    iii.  Order Defendant to disclose all responsive, non-exempt records by a date certain without further delay;

    iv.  Order Defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;

    v.  Retain jurisdiction of this action to ensure no agency records are wrongfully withheld;

    vi.  Award Plaintiff its costs and reasonable attorney's fees incurred in this action; and

    vii.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted this 7th day of November, 2019.

By:    \_\_\_\_\_/Ross A. Nabatoff_____

Ross A. Nabatoff, DC Bar # 376665
LAW OFFICE OF ROSS A. NABATOFF
1440 G Street, N.W.
Washington, D.C.  20005
(202) 650-0037
*Attorney for Plaintiff*